

IN THE
TENTH COURT OF APPEALS

No. 10-11-00163-CV

IN THE INTEREST OF
D.M., A.M., A.J., AND D.W., CHILDREN,

From the 413th District Court
Johnson County, Texas
Trial Court No. D200906127

MEMORANDUM OPINION

Following a bench trial, the trial court terminated the parental rights of Appellant Misty to four of her children (D.M., A.M., A.J., and D.W.) and of Appellant Jesse to his child D.W.[1]  Misty and Jesse each raise six issues in this appeal, all of which complain about the legal and factual insufficiency of the evidence.  We will affirm.

**Statement of Points**

Because the termination order was signed on April 27, 2011, it is governed by the law in effect on that date.  Act of May 5, 2011, 82nd Leg., R.S., ch. 75, §§ 8-9, 2011 Tex. Sess. Law Serv. 348, 349 (West) ("A final order rendered before the effective date [Sept.

---

[1] The respective fathers of D.M., A.M., and A.J. voluntarily relinquished their parental rights.  They are not involved in this appeal.

1, 2011] of this Act is governed by the law in effect on the date the order was rendered, and the former law is continued in effect for that purpose."). Former Family Code subsection 263.405(b)(2) provides that a statement of the points on which the party intends to appeal must be filed within fifteen days of the date the final order is signed. Act of May 21, 2007, 80th Leg., R.S., ch. 526, § 2, 2007 Tex. Gen. Laws 929 (formerly TEX. FAM. CODE ANN. § 263.405(b)(2)), *repealed by* Act of May 5, 2011, 82nd Leg., R.S., ch. 75, § 5, 2011 Tex. Sess. Law Serv. 348, 349 (West). Former Family Code subsection 263.405(i) provides: "The appellate court may not consider any issue that was not specifically presented to the trial court in a *timely filed* statement of the points on which the party intends to appeal or in a statement combined with a motion for new trial." Act of May 12, 2005, 79th Leg., R.S., ch. 176, § 1, 2005 Tex. Gen. Laws 332 (emphasis added) (formerly TEX. FAM. CODE ANN. § 263.405(i)), *repealed by* Act of May 5, 2011, 82nd Leg., R.S., ch. 75, § 5, 2011 Tex. Sess. Law Serv. 348, 349 (West).

The Texas Department of Family and Protective Services asserts that Misty's statement of points was due to be filed no later than May 12, 2011, but because it was filed by her appointed appellate counsel on July 13, 2011—sixty-two days late—Misty's issues cannot be reviewed on appeal. The record reflects that Misty was represented by appointed trial counsel during the time period for filing the statement of points, that appointed trial counsel moved to withdraw and to request appointed appellate counsel on June 3, and that the motion was granted and appellate counsel was appointed on June 14.

Neither of Misty's counsel moved to extend the time for filing the statement of

points, and she does not raise ineffective assistance of counsel in this appeal.  And while she asserted the unconstitutionality of former subsection 263.405(i) in her untimely statement of points, she does not raise it or brief it.  Accordingly, we are constrained by the statute and cannot review Misty's six sufficiency issues, which are dismissed.  *See, e.g., In re T.R.F.,* 230 S.W.3d 263, 265 (Tex. App.—Waco 2007, pet. denied) ("Under the express terms of the statute, we *cannot* consider T.F.'s issues on appeal because her statement of points was untimely filed."); *see also In re M.P.,* No. 04-08-00881, 2009 WL 2413694 (Tex. App.—San Antonio Aug. 5, 2009, no pet.) (mem. op.).

### Sufficiency of the Evidence

In a proceeding to terminate the parent-child relationship brought under section 161.001, the Department must establish by clear and convincing evidence two elements: (1) one or more acts or omissions enumerated under subsection (1) of section 161.001, termed a predicate violation; *and* (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(1), (2) (West Supp. 2011); *Swate v. Swate,* 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied).  The factfinder must find that both elements are established by clear and convincing evidence, and proof of one element does not relieve the petitioner of the burden of proving the other.  *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex. 1976); *Swate,* 72 S.W.3d at 766.  If multiple predicate violations under section 161.001(1) were found in the trial court, we will affirm based on any one ground because only one predicate violation under section 161.001(1) is necessary to a termination judgment.  *In re S.N.,* 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.); *In re T.N.F.,* 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied).

The Department sought termination of Jesse's parental rights to D.W. under Family Code section 161.001(1)(D) (knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being) and section 161.001(1)(E) (engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being). *See* TEX. FAM. CODE ANN. § 161.001(1)(D, E). The trial court's order made affirmative findings on these two grounds and found that termination of the parent-child relationship between Jesse and D.W. is in the child's best interest. The trial court also issued findings of fact and conclusions of law on these two grounds. Jesse's first four issues assert that the evidence is legally and factually insufficient to support the trial court's findings under sections 161.001(1)(D) and 161.001(1)(E).[2]

The evidence shows that Jesse and Misty became involved in July 2007; they began living together immediately and D.W. was born in April 2008.[3] At that time, they and Misty's three other children were living with Misty's elderly grandmother in Alvarado. In August 2008, the Department received a referral concerning neglectful

---

[2] The standards of review for legal and factual sufficiency in termination cases are well-established. *In re J.F.C.,* 96 S.W.3d 256, 264-68 (Tex. 2002) (legal sufficiency); *In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency). Due process requires the petitioner to justify termination of parental rights by "clear and convincing evidence." *Spangler v. Texas Dept. of Prot. & Reg. Servs.,* 962 S.W.2d 253, 256 (Tex. App.—Waco 1998, no pet.). This standard is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.*

[3] At that time, Misty was the mother of four children by three different men. One child, D.Z., who is not involved in this case, was subsequently placed outside of Misty's home, and Misty had only supervised visitation. The Department first received a referral on Misty in 2001, and it was "ruled out." She was also referred to the Department in 2004, twice in 2006, and once in 2007. Some of the referrals involved physical violence and neglectful supervision. After the 2004 referral, the Department required Misty to participate in a safety-based plan. In 2006, Misty voluntarily placed her children with her mother for two and a half months while Misty got "back on her feet."

supervision and physical neglect as to all five children. The allegations involved drug (methamphetamine) use by Pamela, Misty's cousin, in whose house Misty, Jesse, and the children were living at the time. When the Department investigator went to the home in response to the referral, she saw that Misty left D.W., then about four months old, sitting in a swing and crying for a long period of time. When the investigator suggested that Misty interact with D.W. and pick him up, Misty responded that she was "not going to raise a hip baby." Misty denied making that statement. Misty's and Jesse's knowledge of Pamela's drug use in the home was disputed at trial.

The investigator also determined that D.W. had a "flat spot" on the back of his head, which seemed surprising to Misty and Jesse. Misty claimed that it was ruled non-neglectful by E.C.I. because there was only minimal balding. The Department was also concerned that the children were not clean or wearing appropriate clothing to school. There were also concerns about D.M.'s aggressive behavior and his statement that Jesse picked on him. Misty testified that in 2008, Jesse spanked the children with a paddle. Jesse admitted to spanking all the children, except the baby D.W.

On April 27, 2009, Misty took D.W., who was then one year old, to the emergency room at Huguley Hospital in Burleson. He was transferred by ambulance to Cook Children's Medical Center in Fort Worth, where he was admitted for cellulitis and an abscess on his right buttock, with redness and swelling extending to his right scrotum. D.W. was given antibiotics, but ultimately the abscess had to be drained surgically. There were signs of a prior abscess, which Misty said had been treated with antibiotics. During this hospitalization, a physician became concerned about "greenish"

bruises on D.W.'s forehead and "purple and red" bruises on his ear and requested that Donna Wright, a pediatric nurse practitioner with the hospital's CARE team, evaluate whether D.W. had been physically abused.

Wright testified that multiple bruises on young children raise a suspicion of non-accidental trauma and that bruising on the ear is difficult to get accidentally because of how one-year-olds fall. D.W. had multiple bruises to his forehead, "pinpoint" bruising to his lower right earlobe and below the ear, bruising to the inner surface of the right ear, and a linear abrasion to the right lower cheek, all in different stages of healing. Misty told Wright that the ear bruising was caused by D.W.'s falling into the corner of a coffee table and that for the head bruising, D.W. had fallen off the bed the prior week. Misty and Jesse later told a caseworker that a ceramic doorstop may have fallen on D.W.'s head. Wright thought that the coffee-table explanation was not consistent with the ear bruises.

Because Wright had seen such bruising on abused children, she ordered a skeletal study for broken bones and a head CAT scan for skull and brain injuries. The CAT scan revealed a healed, non-depressed linear fracture of the occipital bone, which Wright described as a fracture to the back of the head. She said that the occipital bone and back of the head are the thickest part of the skull and that it would take a "tremendous amount of force" to fracture the bone, but that such a fracture is not seen from a small child who falls while standing because there is not enough force from the short distance to the ground. Misty and Jesse said they did not know how D.W. received the skull fracture. Wright said that falling off the bed the week prior would

not have caused the healed fracture, and she could not rule out the possibility that the fracture was caused by D.W. being hit with something. She also said that it was possible Misty did not know what happened to D.W. to cause the skull fracture, but with the force to cause such a fracture, D.W. would have been crying really hard from the pain.

Wright was also concerned that Misty had allowed D.W.'s abscess, which Wright described as "very serious," to progress as far as it did before seeking medical care, especially since D.W. had experienced one previously. The abscess was caused by a staph infection that could have begun with a break in the skin such as with diaper rash.

Because of these injuries to D.W., the Department received a referral raising concerns of physical neglect and physical abuse. After investigating, the Department found reason to believe physical neglect as to all of the children, based partially on the home's appearance, and found a reason to believe for physical abuse of D.W. by an unknown perpetrator.

Because Misty's mother agreed to take in the children, the Department did not seek removal but offered family-based safety services to Misty and Jesse. They entered into a safety plan that placed the children in Misty's mother's home, specified that Misty and Jesse could not have unsupervised contact or overnight visits, and imposed various requirements on Misty and Jesse, including participation in counseling and anger-management services.

Ninfa Torres, a Department supervisor, said that Misty and Jesse did not complete their services, as they would cancel them or miss visits. The Department set

up counseling services for the children, but Misty and Jesse did not take them to appointments and failed to follow through in setting up appointments. The children also were not current on their immunizations. It was also discovered that Misty and Jesse had been violating the safety plan by staying overnight with the children and having unsupervised contact. After Jesse had an altercation with daycare staff when picking up the children, and after reports of D.M. becoming more aggressive and disturbed, the Department sought and obtained the children's removal and sought termination in October 2009.

After removal, Mary Binder, a Department caseworker, prepared a service plan for Misty and Jesse. Jesse completed many of his services, but she thought that he did not demonstrate that he had learned from those services. He disappeared and had no contact with the children from June through December 2010. In June, he had moved to Galveston to work for two months, but he did not inform the Department. When he returned, Misty was in jail (she was jailed from June until September for the offense of unauthorized use of a car) and Jesse was homeless at some point during this time period. At the time of trial, Misty and Jesse were living in a two-bedroom apartment in Fort Worth, with rent assistance from Catholic Charities, but that was to end on June 1, 2011.

Jesse acknowledged that he has been arrested at least thirteen times since 1999. He has been arrested for assault, possession of marijuana, burglary, criminal trespass, and evading arrest. He has three assault convictions, the most recent being in 2007, and he also has convictions for public intoxication, theft under $1,500, criminal mischief,

possession of a volatile chemical, and criminal trespass. In addition to being homeless for a few months in 2010, he was homeless for about six months in 2008.

To endanger means to expose to loss or injury, to jeopardize. *Texas Dep't Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987); *see also In re M.C.,* 917 S.W.2d 268, 269 (Tex. 1996). The specific danger to a child's physical or emotional well-being need not be established as an independent proposition, but it may be inferred from parental misconduct. *See Boyd,* 727 S.W.2d at 533.

> When termination of parental rights is based on section D, the endangerment analysis focuses on the evidence of the child's physical environment, although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being. *In re S.M.L.,* 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Section D permits termination if the petitioner proves parental conduct caused a child to be placed or remain in an endangering environment. *In re R.D.,* 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

> It is not necessary that the parent's conduct be directed towards the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards. *In re S.M.L.,* 171 S.W.3d at 477. Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *Id.* (citing *In re Tidwell,* 35 S.W.3d 115, 119-20 (Tex. App.—Texarkana 2000, no pet.) ("[I]t is not necessary for [the mother] to have had certain knowledge that one of the [sexual molestation] offenses actually occurred; it is sufficient that she was aware of the potential for danger to the children and disregarded that risk by ... leaving the children in that environment.")). In considering whether to terminate parental rights, the court may look at parental conduct both before and after the birth of the child. *Avery v. State,* 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no pet.). Section D permits termination based upon only a single act or omission. *In re R.D.,* 955 S.W.2d at 367.

*Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also In re C.W., Jr.,* No. 14-09-00306, 2009 WL 4694946, at *6 (Tex. App.—Houston

[14th Dist.] 2010, no pet.).

Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re K.A.S.,* 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied); *Dupree v. Tex. Dep't Prot. & Reg. Servs.,* 907 S.W.2d 81, 83-84 (Tex. App.—Dallas 1995, no writ).

> Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.,* 121 S.W.3d at 125; *see* TEX. FAM. CODE ANN. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd,* 727 S.W.2d at 533; *J.T.G.,* 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd,* 727 S.W.2d at 533; *In re R.W.,* 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

*In re T.T.F.,* 331 S.W.3d 461, 483 (Tex. App.—Fort Worth 2010, no pet.).

We hold that the evidence is legally and factually sufficient to allow the trial court to form a firm belief or conviction that, under section 161.001(1)(D), Jesse knowingly placed or knowingly allowed D.W. to remain in conditions or surroundings that endangered his physical or emotional well-being, especially given D.W.'s unexplained skull fracture. *See, e.g., C.W., Jr.,* 2009 WL 4694946, at *6 ("Appellant admits that D.G. suffered physical harm, but argues that the evidence is unclear regarding how D.G. sustained her injuries and who caused them. This argument is irrelevant to termination under section 161.001(1)(D). … The record here demonstrates that D.G. was exposed to injury and was in fact subjected to severe physical injuries."). We overrule Jesse's first and second issues.

We further hold that the evidence is legally and factually sufficient to allow the trial court to form a firm belief or conviction that, under section 161.001(1)(E), Jesse engaged in conduct or knowingly placed D.W. with persons who engaged in conduct that endangered his physical or emotional well-being. The evidence shows Jesse's extensive criminal history,[4] instability,[5] violation of the safety plan and six-months' disappearance during the case,[6] and medical neglect relating to the D.W.'s skull fracture and abscess.[7] We overrule Jesse's third and fourth issues.

In issues five and six, Jesse complains that the evidence is legally and factually insufficient to support the trial court's finding that termination is in the best interest of D.W. In determining the best interest of a child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for

---

[4] *See, e.g., Karl v. Tex. Dep't Prot. & Reg. Serv's.,* No. 03-03-00655-CV, 2004 WL 1573162, at *2-3 (Tex. App.—Austin July 15, 2004, no pet.) (mem. op.) (engaging in criminal conduct endangers emotional well-being of child because of parent's resulting incarceration).

[5] *See, e.g., R.W.,* 129 S.W.3d at 739 ("conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child").

[6] *See, e.g., In re J.O.A.,* 283 S.W.3d 336, 346 (Tex. 2009) (noting probative value of parent's irresponsible choices); *In re K.C.B.,* 280 S.W.3d 888, 895 (Tex. App.—Amarillo 2009, pet. denied) (violating safety plan is conduct endangering child).

[7] *See, e.g., In re S.J.,* No. 14-07-00785-CV, 2009 WL 442485, at *2-3 (Tex. App.—Houston [14th Dist.] Feb. 24, 2009, no pet.) (mem. op.) (finding medical neglect to be omission endangering to child's physical needs).

the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72. This list is not exhaustive, but simply indicates factors that have been or could be pertinent. *Id.*

The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree,* 907 S.W.2d at 86. The goal of establishing a stable permanent home for a child is a compelling state interest. *Id.* at 87.

*Desires of the child:* At the time of trial, D.W. was almost age three, so there is no direct evidence of his desire.

*The child's emotional and physical needs now and in the future and the emotional and physical danger to the child:* Evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Williams,* 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns,* 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."); *see also In re V.A.,* No. 13-06-00237-CV, 2007 WL 293023, at *5-6 (Tex. App.—Corpus Christi 2007, no pet.) (mem. op.) (considering parent's past history of unstable housing, unstable employment, unstable relationships, and drug usage). Often, the best interest of the child is infused with the statutory offensive behavior. *In re W.E.C.,* 110 S.W.3d 231, 240 (Tex. App.—Fort Worth 2003, no pet.). Parental knowledge of the occurrence of an actual offense that endangers a child's emotional or physical well-being is not necessary; it is sufficient that the parent was aware of the potential for danger and disregarded the risk. *In re R.G.,* 61 S.W.3d 661, 667-68 (Tex. App.—Waco 2001, no pet.), *disapproved of on other grounds by In re J.F.C.,* 96 S.W.3d 256 (Tex. 2002).

When D.W. was removed and put in a foster home, he was initially very

aggressive. He would bang a toy to the floor when he was upset or would hit the toy and say, "bad toy." And although only one year old, he would bite and hit the foster mother and would try to hit a younger child in the home. He would also hide food, wanted to eat constantly, and would try to drink out of the toilet. He had difficulty walking with shoes on, and he was behind on his immunizations.

The evidence on these factors, including the statutory offensive behavior, weighs in favor of the best-interest finding.

*Parental abilities and available programs:* The evidence shows that D.W. suffered from medical neglect and unexplained injuries at home and that after removal, Jesse disappeared for about six months and had no contact with D.W., and was homeless for some time. Though Jesse did not participate in the offered family-based safety services before removal, he did complete the services (classes or courses) in the service plan. The caseworker thought that he did not demonstrate learned knowledge from them, and the Department points out that after participating in these services, Jesse disappeared for six months without contact with D.W., and became homeless.

In the months just before trial, Jesse got a job and was making $1,000 to $1,600 a month. Misty also got a part-time job at a fast-food restaurant the month before trial and made about $500 every two weeks. They also donated plasma for money. He and Misty had a two-bedroom apartment (with rent assistance) and had acquired furnishings and toys for the children, but evidence of a recent improvement does not absolve a parent of a history of irresponsible choices. *In re T.C.,* No. 10-10-00207-CV, 2010 WL 4983512, at *8 (Tex. App.—Waco Dec. 1, 2010, pet. denied) (mem. op.) (citing

*J.O.A.,* 293 S.W.3d at 346); *Smith v. Tex. Dep't Prot. & Reg. Serv's.,* 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.). The evidence on these factors weighs in favor of the best-interest finding.

*Plans for child and stability of the home:* The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re S.H.A.,* 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc). The goal of establishing a stable permanent home for a child is a compelling state interest. *Dupree,* 907 S.W.2d at 87.

The three older children were placed in a therapeutic group home, and D.W. was placed in a foster-care home. The Department's plan is to place D.W. for adoption. In addition to being behind on his immunizations, he has a heart murmur, asthma, and allergies and needs continuing medical care. D.W. was doing well in his placement, was receiving speech therapy, and was making tremendous progress. The caseworker acknowledged that Jesse and Misty love D.W. (and the other children) and wanted them back in their home, but her opinion was that termination was in their best interest.

Jessie and Misty's plan was to have the children returned and to get a three-bedroom apartment with rent being $825 a month, which they thought they could pay even when the rent assistance ended. At the time of trial, Jesse had had his current job for only two months. They stated they would take the children to appointments, but they would have to rely on friends with cars or the bus to do so. The trial court, as the finder of fact, was free to reject their assertions of future stability, particularly given their history of instability. *See In re B.S.W.,* No. 14-04-00496-CV, 2004 WL 2964015, at *9

(Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.) ("Ms. Woods has failed to show that she is stable enough to parent B.S.W. for any prolonged period. The trial court was entitled to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption.").

The evidence on these factors weighs in favor of the best-interest finding.

*Acts or omissions and any excuses for them:* The Department points again to Jesse's criminal history, homelessness, and disappearance for six months as evidence that the parent-child relationship is not a proper one. Jesse points to evidence that he had bonded with D.W. and Misty's other children and that he did not know about D.W.'s skull fracture or what had caused it. And according to Misty, he did not see the children for months because the caseworker would not return his phone calls.

The evidence on these factors weighs in favor of the best-interest finding.

In conclusion, on the trial court's finding that termination of Jesse's parent-child relationship with D.W. would be in his best interest, considering all the evidence in relation to the *Holley* factors in the light most favorable to the trial court's finding, we hold that a reasonable trier of fact could have formed a firm belief or conviction that termination was in the child's best interest. *J.F.C.*, 96 S.W.3d at 266. And viewing all the evidence in a neutral light in relation to the *Holley* factors, we hold that the trial court could have reasonably formed a firm belief or conviction that termination was in D.W.'s best interest. Accordingly, the evidence is factually sufficient on the best-interest finding. We overrule Jesse's issues five and six.

We affirm the trial court's order of termination.

REX D. DAVIS
Justice

Before Chief Justice Gray,
    Justice Davis, and
    Justice Scoggins
Affirmed
Opinion delivered and filed January 18, 2012
[CV06]